Good morning, Your Honors. May it please the Court. My name is Oscar Ollave. I represent the appellant, Jose Luis Morales. I briefed several issues, but I'd like to focus my time exclusively and address the co-tenant consent issue. I would like to rest on my briefs on the remaining issues. This case before the Court is a co-tenant consent search case that, according to the District Court, falls somewhere between Matlock and Randolph. Now the District Court . . . Judge Goldberg May I ask you just a preliminary question for a moment just so I understand what it is that you are arguing, that I have . . . you argue any of them, but I just want to make sure I have the totality of the argument. Oscar Ollave Yes, Your Honor. Judge Goldberg I'm just talking about the search issue . . . Oscar Ollave Yes, Your Honor. Judge Goldberg . . . the search and the consequential statement that's issued after, that he makes after that. If I have your argument right, you're saying two things. One, you're saying the warrantless search was no good, first because the defendant was there, they didn't get consent from him, and they ought to have gotten consent from couldn't provide what he did not provide. That's argument one, right? Oscar Ollave Correct. Judge Goldberg Okay. The second argument you make, if I have it right, is, notwithstanding that, and in any event, Ms. Lange's consent was not voluntary. Oscar Ollave Your Honor . . . Judge Goldberg Right? Oscar Ollave We would admit, for the sake of argument, that her consent was voluntary. In other words, we would assume, but not admit, that her consent was voluntary. And we would also admit that she had authority. And so I will not be addressing that part of the search issue, of the Fourth Amendment issue, Your Honor. Judge Goldberg So the only claim you're making is that they had to get his consent, and as a co-occupant, she couldn't trump him without him saying okay. Oscar Ollave My argument is that the consent that they obtained was not effective as to him, because his Fourth Amendment rights were violated by the police conduct. Judge Goldberg Wait, wait. That's too general. His Fourth Amendment rights were violated by what police conduct? Are you talking about the failure to ask him for consent when he was present? Are you talking about any conduct towards the co-tenant? Oscar Ollave Only as to him, Your Honor. That he was not asked, that he was not told that a search was being conducted, but most importantly, that he was precluded from expressing an objection because he was detained. He was handcuffed and detained 20 feet from the door of the house while the consent colloquy was going  on. Judge Goldberg So you are not making a point that he was absent? Oscar Ollave Your Honor, the district court found that he was present. The district court adopted the magistrate's R&R and found that he was physically present. It found that he was not present at the door when the officer spoke with the co-occupant, that he was not involved in the conversation between the officers and his consent, and that he never refused consent prior to the conversation. And I'm suggesting the colloquy in the living room. The court also goes on to say that he was not placed under arrest and was otherwise unavailable, or was otherwise unavailable. In other words, he was available. And it reiterates that and says he was perfectly available to be asked, but he was not asked whether he consented to the search, and he failed to sua sponte, express any objection to the search. Judge Goldberg What specifically was the finding and evidence as to whether he knew a search was going on? Oscar Ollave The record is void of any evidence that he was told that there was a search going on, or they were about to do a search, or that they were in the process of a search. Judge Goldberg And where exactly was he in terms of the front door of the house? Oscar Ollave When the police . . . he was . . . this house faces north. The front door faces north. He was on the east side. That's expressed in the judge's order denying the motion. It was a . . . Judge Goldberg But east side is a quadrant, basically. Does it say where he was? Could he see the front door from where he was? Oscar Ollave It's not clear, Your Honor. It's not clear. Well, Your Honor, there is testimony that the cohabitant of the property opened the door, and saw the defendant handcuffed. Now, I don't know how far she had to step out to look, but he was to the right of the front door. Judge Goldberg So if she could see him, assuming he wasn't turned around with the back to her, he could see her? Oscar Ollave Yes, but he could not . . . I don't believe he could see into the living room, or he could hear the conversation that went on. Judge Goldberg If he could see the front door . . . Oscar Ollave Yes, Your Honor. Judge Goldberg . . . which is what we just talked about . . . Oscar Ollave Yes, Your Honor. Judge Goldberg . . . he could see the officers going into the  Oscar Ollave He was not told the purpose of their visit, and Your Honor, in this case . . . Judge Goldberg So you're arguing for the proposition that co-occupants, or co-tenant as we call them, even if they're just co-occupants, consent isn't valid unless the police officers go to the defendant and say, we're going to ask the co-tenant for permission to search. Would you like to object? Oscar Ollave Your Honor, I think that that's clear under Randolph that when the police arrive at a residence, and they have reason to believe that there's more than one tenant, and they're both present, they have an obligation to ask both tenants for permission. Judge Goldberg I thought what Randolph said is if one tenant objects the co-tenant's . . . the co-tenant's consent can't override the objection, but it didn't say the officers had an affirmative duty to go ask the defendant if he objected, did it? Oscar Ollave Your Honor, I would suggest that whatever rule the court finds in this case, that it be one that is respectful of the reasonable expectation of somebody of privacy in their home. In this case, the officer that first spoke to Mr. Morales had done a background check on him. He had received an anonymous tip, and in that background check, he had established that he was a resident of this house. When he first came up to him, he knew that this man lived in the house, and in fact, he asked him some questions . . . Judge Goldberg I don't understand that to be disputed here, but what I'm talking about is suppose they go to the house, and the defendant isn't there, and the co-tenant says, he's at Billy's Nightclub across town. They got to go to Billy's and ask him for permission? Oscar Ollave Well, Your Honor, that was the rule in Matlock that they don't, and the reason for that is because the court did not want to impose a burden on the police that would perhaps hamper their investigations if they had to go out and look for every possible person that had a right to object to the search. But in this case, the police officer that was leading the search, the first person that he talked to that had a connection with this house was Mr. Morales, and Mr. Morales was cooperative. He was truthful. He was also handcuffed, and, Your Honor, with regards to the handcuffing, I want to make a point that the district court did not have the benefit of the testimony, of the accurate testimony of the police officers regarding the fact that the client was handcuffed. And when they testified at the suppression hearing, they suggested that, in fact, he wasn't. The lead detective was asked, what, if anything, did you do? Did you detain them? Did you leave them alone? And his answer was, I saw them standing. I didn't think there was any reason not to stop them. Judge Goldberg Does he object? Oscar Ollave This is not the motion to suppress, Your Honor. Judge Goldberg And does he object? Oscar Ollave No, Your Honor. Judge Goldberg Does your client ever say, in words or substance, while he's detained on the front lawn, not yet under arrest, but under detention, I object to you going in and searching that house? Oscar Ollave Your Honor, there was the purpose of the police visit. Judge Goldberg No, no, no. But that isn't my question, and that may be Oscar Ollave He did not, Your Honor. Judge Goldberg a point to make, but I simply want to know whether or not he objected. Oscar Ollave He was silent. He did not conform to the search of his home, saying, it's mine. A co-occupant can't give consent to go in. I object. Judge Goldberg Your Honor, he did not. Judge Goldberg Why isn't that fatal to the position? If you look at the holding of the Supreme Court in Randolph, it requires a physically present inhabitant to expressly refuse consent to a police officer. That would be dispositive, regardless of the consent of a fellow occupant. But isn't the law clear, and maybe I've misunderstood it. I always thought the law was, he's got to object in some form or fashion to doing it. If he's asleep, they don't have to wake him up and ask. He loses. If he's under arrest in a police car, they don't have to go to him and say, I want permission. He's got to object. He's got to be there. Otherwise this exception to the power of a co-occupant to consent is good. What am I missing? Judge Goldberg Well, Your Honor, the Supreme Court in Randolph saw this case coming over the horizon, and in dicta they said that the consent by one co-occupant might not be sufficient if there's evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection. The police officer knew that he was a potentially objecting tenant. They took him outside and basically immobilized him. Judge Goldberg There's no finding in this case of that. Judge Goldberg That he knew? Judge Goldberg No, that the purpose of the police officers arresting him, handcuffing him, taking him outside was to remove any potential objection. Judge Goldberg Your Honor, I would suggest that the determination of the analysis of Fourth Amendment issues is driven by reasonableness. And reasonableness is determined by a totality of the circumstances. And I think that if you consider the investigation and the knowledge that the police officer had regarding Mr. Morales . . . Judge Goldberg Did you argue this factual and legal theory to the district court? Judge Goldberg Your Honor, I was not the attorney at the . . . Judge Morales I'm sorry. When I say you, I'm talking about you, the defendants. Judge Goldberg Your Honor, I cannot say. Judge Morales Well, if . . . Judge Goldberg I don't . . . opportunity to make a finding of fact on that and you forfeited the issue, you being the defendant. Judge Goldberg Your Honor, I'm going to say that I believe that it was argued . . . No, no. I will say it was argued, Your Honor. And in fact, he argued that . . . Judge Morales It was argued that the consent of the co-tenant was invalid because they removed the defendant from the front of the house for the specific purpose of not allowing him to object to what was going on. Judge Goldberg Yes, Your Honor. My recollection is that that was . . . Judge Morales And in response, since that's your recollection, in response what did the district court say, District Court Magistrate Judge? What's the finding of fact as to whether that, as a historical matter, is true about the officer's purpose? Judge Goldberg He was not asked and he failed to respond to express an objection and it was denied. Judge Goldberg Let me ask you the question . . . The district court didn't address your factual predicate that their purpose of removing him was so . . . their subjective motivation in removing him was to prevent him from objecting. You asked the district court to find that. You argued that that was what happened and the district court didn't find it. Judge Morales Your Honor, again, I wasn't there but my I would just say that the subjective intent of the police officer is not an issue. It's always an objective consideration. Judge Goldberg No, no. I understand about reasonableness for arrest and that sort of thing but when you say that what Randolph stands for is the proposition that if the police officer removes somebody from a house in order to prevent that person from objecting so a co-tenant can consent and he can't object about it, then you're talking about motivation and that is subjective. It has to be subjective. You don't say would a reasonable police officer have had the motivation. That kind of record has to be built in the district court and to the extent that you bracket your predecessor counsel, close bracket, failed to do so, then the defendant hasn't made out the exception to the co-tenant consent. Judge Morales Your Honor, the language which in the opinion that states that when the police act in that manner, the following line right afterwards it says in the opinion that it's determined by reasonableness and I believe it says by an objective standard. Okay. Judge Goldberg Let me just, if I might, come back to where I began counsel just so I understand the totality of the arguments you've made. Beyond the argument, the Randolph argument, is there any other argument you make? Judge Morales No, Your Honor. Judge Goldberg I just want to be very clear about this point. The only argument on suppression that you make is the Randolph argument. To it, your client had to be given the opportunity to say no, he wasn't, he, and therefore, Lange didn't have the power to consent to this search in words or substance. Judge Morales That's correct, Your Honor. Judge Goldberg There isn't in addition, the reason I raise it is in your brief, you also say there's a question about whether her subsequent consent was any good. Then the government comes back in its response of pleading and looks at this question of Delancey and the question of even if the initial entry was no good, that it tainted, whether it did, it tainted the subsequent consent. That's not your argument here. You're not going into the taint. I don't think you don't go into Delancey, even raise it in your, in your blue brief. I just want to make sure I got that right. Judge Morales Just, I'm not. Judge Goldberg Do I have that right? Judge Morales Your Honor, I'm not conceding those issues. Judge Goldberg But you don't argue the issue. That's the problem. Judge Morales We're resting on the briefs as to those issues. Judge Goldberg That's what I'm trying to have you help me. When you rest on the brief and I looked at the blue brief. Judge Morales Yes, Your Honor. Judge Goldberg I didn't see you make a Delancey argument. to it, even if she validly, voluntarily consented, the consent. The problem is the initial illegal entry tainted the whole thing. Judge Morales I believe that argument. Judge Goldberg That is not. You made that argument in the blue brief. You show me where. See, if I look at the topical heading on page 14, that's where you make the argument. The district court erred in denying the motion to suppress. It was warrantless. The law enforcement failed to obtain consent from the defendant when the defendant was present in the front of the yard and was available to grant or deny consent and where they did not otherwise have probable cause to search. And then when you go into the argument, you only come out of it on page 18 and you make reference to there's some question as to whether Lange's consent was truly voluntary since there were a team of police officers together with a police dog that came to the door and advised they wanted a searcher. Further Lange doesn't speak English, was shown a piece of paper. She thought it was a permit to come in. She thought she had no choice. She signed it. That's the argument that you make. Yes, fold one. Police never asked him for consent to her consent was not truly voluntary. Correct. That's the beginning and the end of the argument to fold. Yes, sir. It isn't. You don't make a Delancey taint argument and come back and say temporality, intervening causation, purpose, exploitation, none of that's in the blue brief. Just want to make sure in fairness that that's not an argument you were raising, although it comes up in response and in reply. Right. That's correct, Your Honor. Thank you. Thank you. Counselor, are you able, I'm sorry, just to touch on that in light of any discrepancies that may have existed in the testimony of the officers at the motion to suppress? Are you able to just briefly touch on the Delancey issue or analysis?  Not with respect to their purpose, their true purpose for being there. The detectives in their testimony, their purpose was to get a consent. And they state that repeatedly, both Detective Rodriguez and Detective Torres, that their purpose in going to the house was to get a consent. And I believe that the district court found that and held that the taint was dissipated. But you're not arguing that that was error. That's not the heart of what you're complaining about. Do I have that right? That's right, Your Honor. Okay. Okay, thank you. We'll hear now from Ms. Darrow. Good morning, may it please the court. My name is Myisha Darrow and I represent the United States of America. Your Honor, as been stated, the Supreme Court has consistently held that an officer only needs voluntary consent. And that consent can come from a third party. His argument is not if you remove the defendant, prevent the defendant from objecting with the purpose of not letting the defendant object. Well, Your Honor, the defendant wasn't removed. The officer that initially approached him found him in the yard, in the street with the car that was obstructing the traffic. So they approached him. They never removed him. And Your Honor, from the record, I do believe that the defendant is able to see the front door because . . . Before we go to that, was the defendant handcuffed? Your Honor, the district court didn't make that factual finding because it wasn't . . . I know, but was it undisputed he was handcuffed? Judge, I think at the point he was arrested, I think it's undisputed. And the reason why I say that is because at the suppression hearing, Ms. Lane only says she steps out, she sees a man sitting on the floor, ground. Ms. Roman says they're all handcuffed at the suppression hearing. But at the trial when she testifies . . . She doesn't mean they're handcuffed at the suppression hearing. She testifies at the suppression hearing they were handcuffed at what point in time? She doesn't say at what point. When she comes out the house, she sees them. But I, but Your Honor . . . I thought that he wasn't arrested. He was detained on the front lawn, but that he wasn't arrested until after they obtained the written consent from Ms. Lane, searched the house, and found the firearms in the other room. Only then did they place him under arrest. Correct, Your Honor. And I believe that . . . But if they detain him out of range of objecting, knowing what's going on in objecting, that's the same thing, whether he's under arrest or detained. Your Honor, he's not outside of the range of being able to object. In fact, when he gives his statement later to the police . . . But how far was he from this record . . . It says 20 . . . From the, from where he was being detained on the front lawn and the front door of that house? It's 20 to 25 feet is what the record indicates. From the house, the eastern side of the house, the western side, southern side, the northern front, what? From the eastern side of the house, from the front door, 20 to 25 feet. The front door is on the east? No, the front door would be to the northerly side of the house, but he's on the east side of the house. But he's able to see the front door. Just to come back to Judge Karn's question, just so that I'm clear, can we tell from the record whether when he was detained, wherever it was that he was detained, however far it was to the north, was he cuffed or not? When he was under detention, but before they formally placed him under arrest? Your Honor, I would submit to you, no, because of the witness's testimony. Roy Reed . . . There's no finding, but you say the facts suggest he was not handcuffed at that time? Correct. There's no factual finding because it wasn't raised at the suppression hearing. But I was going to say, Roy Reed, one of the gentlemen that was detained with him, he's the one that had a firearm, who handed it over to the police, and was told to just wait there. He said that they were told to sit on the ground, and there were two people arrested, which included a defendant, and they were handcuffed. Also at the trial, Erica Roman, who at the suppression hearing said they were all handcuffed, she says at the trial, she doesn't know if they were handcuffed. She retracts that statement and says, I don't know. I didn't see that. She just indicated that she saw their hands, but she didn't know if they were handcuffed. So that's why I submit to the court that there's no factual finding or evidence that he was actually handcuffed prior to being arrested. Under controlling law, as you see it . . . Forget the precise facts of this case. Under controlling law, as you see it, could the police officers intentionally take the not physically in a position to object, put him in a car, park it three blocks away, and then get consent from a co-occupant? Well, Your Honor . . . And you lawfully do that under the state of the law today, in your view? Your Honor, in my view, I think it would be more problematic if that was the motivation of the police officers in moving the defendant. If he's moved for a reasonable reason, then I would not think that them moving the defendant affects their ability to act as a co-defendant. Because I thought there was case law out there, and maybe I misunderstood it, that if he's under arrest in a police car away from the scene, he's in a position no different than he's in the house. He's asleep. They no more have to wake the guy up or bring him to the house and say, do you object? We want your consent. And that's why . . . Have I misunderstood that? No, I don't believe you are, Your Honor. That's why I say the motivation for moving them becomes very . . . the individual becomes very important. If he's moved because he's being arrested or being taken somewhere to be questioned, that's different than if an officer is moving them as you . . . For the purpose of making it impossible for him to interpose an objection. So you would suggest if that was the record evidence, and there were findings by a trial judge, that they intentionally moved him away so he couldn't object, under those circumstances, that would be the functional equivalent of him expressly objecting? I . . . I'm sorry, Judge, would you repeat the answer? Yeah. You . . . We know if a occupant of a house at the front door says, I object to you searching my house, and there's someone else there who's an occupant as well, who says, no, I don't object. You can come on in, have at it, I've got nothing to hide. You can't go in. We know that. The Supreme Court's told us that. So if someone's present and they expressly object, you can't go around that by getting the consent from the co-occupant. What I'm asking is, if the police remove somebody, they put them under arrest, and they drive him away, making it impossible for him to interpose an objection, and they do that, among other things, for a purpose of making it impossible, and then they go to the co-occupant and say, we want a consent. She says, sure, come on in, have at it. Can she give consent to those circumstances? One of the purposes was to preclude him from objecting by removing him from the presence. Your Honor, I believe she can still give consent, because there still was a valid reason for removing him, and that was the fact that he was being placed under arrest. Okay, so the whole thing has to be fabricated before you'd say they couldn't do it. Your Honor, I don't know if it has to be completely fabricated, but if there was, go back to motivation, strictly just to prevent that person from objecting, I do think that becomes more problematic. In a situation where someone is under arrest, such as the cases here, then there is a basis to remove that person from the location, and then go back and ask the co-attendant for permission to search. You don't have to give him a chance, but you can take substantial steps to make it impossible. That's really what you're saying. I do believe the case law would support that. Let me ask you this. Was this theory, argument, objection, exception raised before the district court? Did the defendant's counsel at that time, whoever she or he was, argue that the suppression motion should be granted because the police officers, for the purpose of preventing him from objecting to the co-attendant's consent, put him out of a position he could see it, or put him in a place where he couldn't object? Your Honor, I don't believe so. I believe the defense argument at the suppression hearing was that the officers should have asked him. They spoke to him, and from what he stated, the logical next question should have been, could they have consent to search the house, and they did not ask him consent, although he was there and available. All right. There was no dispute. They didn't ask him for consent. No need for a fact finding on that, although there was one implicitly at least. There were no fact findings by the district court on whether or not the police officers had the subjective intent to interfere with or make it more unlikely that he would object to the consent when they detained him, and where they detained him, correct? Correct, Your Honor. Okay. Anything else? Your Honor, if there are no further questions from the United States, I will rest on a brief. Okay. Thank you. Thank you, Your Honor. Counsel, four minutes. Your Honor, you asked a question about handcuffs, and there was testimony at the trial level about handcuffs, not at the motion to suppress. The fact that at the . . . At the trial, what did they say about, was he cuffed when he was detained, but before he was formally arrested? He was cuffed, Your Honor. Before he was formally arrested, but detained on the front lawn. That's correct. Now, we know that when Bertha Lange, the co-tenant, looked out her door, the Detective Phillips was talking to Mr. Morales, and when she looked out the front door, she says he was sitting down handcuffed. That's her testimony. Roy Reed, the person that was quoted by the . . . Who testified at trial about whether he was handcuffed or not? Several people, Your Honor. Detectives . . . They all agreed, the detectives, everybody agreed he was handcuffed? Detective Phillip Torres. The counsels? Yes. Everybody agreed who testified at trial that he was handcuffed? Let me give you the names. Roy Reed did. I don't really care about the names. Was there any dispute at trial about whether he was handcuffed? There was no dispute. He was handcuffed. Okay. Why are we belaboring this? That should have been brought out earlier. We've held that on a motion to suppress, if there's evidence that clarifies any ambiguity at the motion to suppress that's presented at trial . . . I was going to bring that up, Your Honor. I ran out of time. Okay. So we can accept for the purposes of our discussion here today that he was handcuffed when he was detained, period. But also . . . Right? I would just stop at that and just go on to the next argument. I think the court should consider the effect of that difference in the testimony between the motion to suppress and the trial. Because at the motion to suppress, it was almost a misdirection. And so if we had known, or prior counsel had known, that these people were handcuffed, he would have made the argument. Okay. Let me ask . . . Why? I mean, you can object with your handcuffs on just as well. He wasn't gagged, was he? The record is void of any indication that he was gagged. For God's sakes, he could speak. Could he not? He could speak. Okay. Then what difference does it make if he could use his hands? Your Honor . . . He wasn't doing sign language. Well, it's a matter of what his knowledge was. And the record is void that anybody communicated . . . Irrespective of his knowledge, what difference does it make whether he was handcuffed when he did not object? Whatever his knowledge was, what difference does it make if he was handcuffed? Well, the difference would be that he could stand up and walk 20 feet into his living room and say, what's going on here? And he was told, sit down and . . . Well, but he was detained for moving whether he was handcuffed or not. That's correct. So it didn't matter that he was handcuffed or not. That's correct. Let me ask the question again differently and just be sure that I've got the record right. At the outset, I asked you whether he ever objected verbally. Answer no. There may be explanation for why, but the answer to that question was no. Was there any evidence proffered in this case at the suppression hearing or even at the trial that he was detained where he was detained and cuffed when he was cuffed for the purpose or object of preventing him from expressly objecting to consent? The answer is no. But we can conclude that that was the basis because the attorney asked the detective, he was there, you knew that he was a resident, you had verified that he lived there, you asked him all these questions and he answered truthfully. Why didn't you ask him the final question, do you consent to us searching your house? And the answer was, I don't know. I could have, but I didn't. See that I'm running out of time, Your Honors. And again, just so that I'm clear, was that argument ever made to the trial judge or the magistrate judge hearing the matter for suppression? Your Honor, the argument I believe that was made was that he had a right under Randolph to have been asked for his consent and he wasn't. All right. Thank you, counsel. Thank you. Your Honor, I just ask that the court reverse the district court's finding. I appreciate it. Next case up is Pez v. Mulvey et al.